## AFFADIVIT OF CONSTANCE K. LYERLY

I, Constance Lyerly, state the following to the best of my knowledge: I reside at 4805 41st Street N.W., Washington, D.C. My property is located two houses down from 4801, where Ms. Joyce Burnett lives. I have lived at my address for over 26 years. 4801 has been a rental property for over twenty years. Mr. Sharma, the owner of that property, never resided there. Multiple tenants have been there before Ms. Jones leased the property from Mr. Sharma for approximately ten years. Overall, the property has been poorly maintained.

One of the previous tenant's mother (before Ms. Jones) came to my house. She was extremely upset that her daughter was living in the house which was in an appalling state, especially for the large amount of rent. She asked me to come to 4801 as a witness to attest to its state. She said that the upstairs bathroom sink fell through the floor to the kitchen below and it left a large hole in the floor. I did go with her and saw that the fireplace in the living room was separating greatly from the wall. This alone was distressing to me and I didn't want to go any further in the house. She stated that she was going to take Mr. Sharma to court. She had her daughter immediately move out. To this day, I don't know what resulted other than her daughter moving out.

Each time the leasing party moved out, there has been bulk trash, improperly bagged or improperly contained in back of the property. Because of the way it was left, the city's trash removal would not take it away. The neighbors have been forced

06 0036

FILED
JAN 11 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Exhibit 2

to call Mr. Sharma to complain. I have personally spoken with him regarding this issue before Ms. Jones leased the property about previous tenants.

At one point during Ms. Jones's tenancy, the property was in such a dilapidated state that I suggested she to speak with Mr. Sharma regarding necessary repairs and improvements. For example, the screened back porch's screens were rotting and full of huge holes. Instead of replacing the screens within their frames, all the existing screens frames were removed. All that remained were the support structures.

Another time, Ms. Jones's dog would get out of the back yard because the fence was so badly in need of replacing, especially the gate. Mr. Sharma had the back gate replaced but the rest of fence was not repaired. This gate was so poorly constructed that it did not hold up. I suggested to Ms. Jones to have Mr. Sharma correct it. Ms. Jones told me that she couldn't ask Mr. Sharma nor did she give a reason as to why.

I was well acquainted with Ms. Jones while she resided here and was a personal friend. I knew that for most of the time that she leased the property, Ms. Jones sublet rooms in the house. I have not only met many of her female roommates, but she would also tell me when one was moving in or out. Ms. Jones has even asked me on occasions if I knew of anyone needing to rent a room. Once, she asked me to let a prospective female tenant rent out a room in my house until a room became available in hers. Ms. Jones did not want to lose a good potential tenant. I refused to agree with such an arrangement. Thus, she became upset with me.

Ms. Jones never seemed to be able to keep her female house mates for a long period of time. There were so many women renting rooms there over the years that I cannot remember all of their names or faces. Whenever possible, Ms. Jones personally introduced her tenants to me. When Ms. Burnett moved onto the property, another woman was already renting a room in the house. I remember Ms. Jones saying to me that Ms. Burnett was the perfect roommate because Ms. Burnett was never at the house and paid her rent on time.

One housemate that I do remember was named Cecelia. She and Ms. Jones became best friends. Cecelia rented a room there for approximately three years. Ms. Burnett and Cecelia are the only two roommates that I recall living there for an extended period. I even remember when Cecelia had a broken leg during the time she was living there. I attended dinner at Ms. Jones's house on St. Patrick's Day 3 or 4 years ago and Cecelia was there. Although Cecelia had long moved out, she and Ms. Jones remained good friends.

At some point Ms. Burnett told me that she was experiencing problems with her mail. Ms. Burnett said that she was not always getting her mail. If she did receive mail, it appeared to have been opened. 4801 had no mail box or letter slot. Instead, Ms. Jones used a pail-like basket placed out front on a small table. Ms. Burnett told me that Mr. Sharma gave her permission to have a separate mailbox solely for herself and he allowed her to install it on the house. I loaned Ms. Burnett the necessary tools to install the new mail box. Ms. Burnett was very elated over the prospect now of not only receiving all her mail but having it unopened.

3

I remember a conversation with Ms. Jones telling me that Mr. Sharma offered to sell her the house. Ms. Jones had now been there several years. Ms. Jones was upset that she could not make financial arrangements to purchase it. Later, even though Ms. Jones had gotten married, I was surprised to learn that Ms. Jones was moving out. She loved that house and vowed never to leave it.

Earlier in the fall before Ms. Jones moved out, Ms. Burnett had no heat in the house for a period of time. She said that the furnace was blowing cold air and Mr. Sharma would not send over a repairman. I loaned her an electric heater to use in her room until the furnace was fixed.

When Ms. Jones moved out, again, there was a mass of garbage and discarded items, improperly contained at the rear of the house attracting animals. The garbage was discarded in such a manner for two weeks, the trash men would not pick it up. The neighborhood spokesperson called Mr. Sharma to complain about this condition. Only then did Mr. Sharma have the trash and garbage hauled away.

It was Ms. Burnett whom told me that Ms. Jones was moving out because Ms. Jones had recently married. Ms. Burnett told me that she verbally requested to Mr. Sharma to lease the entire house instead of just a room. Ms. Burnett said that she even sent Mr. Sharma a letter attesting to this fact. A few days later after Ms. Jones moved out, I saw a "For Rent" sign with a 301 area code phone number written on it. The sign was placed on the large tree in front of the house. I don't ever recall seeing such a sign while Ms. Jones was looking for housemates. Ms. Jones had told me that she used the Washington Post

4

Classified as one of her sources for advertising. I remember seeing some of her ads.

Around the time Ms. Jones was moving out, Ms. Burnett told me that Mr. Sharma had offered selling her 4801 since Ms. Jones declined. We discussed the issue as to whether or not it would be a good investment. Later, Ms. Burnett told me that she had paid for a property inspection to determine what overall condition the property was in. She said that she was in a position to discuss the price but also had made financial arrangements.

After Ms. Jones had moved out, Mr. Sharma stopped by my house one afternoon, insisting to come in and use my telephone to call the Gas Company. He was told no and yet still persisted. This greatly upset my son whom has special needs and takes multiple medications. I had words that day with Mr. Sharma about upsetting my son, Paul. Mr. Sharma showed no concern about my son. He said that Ms. Burnett was not supposed to be living there at 4801. It was my understanding from listening to him that that he was waiting on the gas man to come and have the gas service shut off because Ms. Burnett was living there. I did not allow him to use my telephone and become a party to that.

On two separate occasions during the coldest days of this past winter, the same main water line pipe burst at 4801. Both times, Ms. Burnett asked me to come over because Mr. Sharma had refused to send a plumber. I saw the damage it did to the kitchen floor. The kitchen floor was covered with approximately an inch of water. Ms. Burnett had to clean up the mess. She brought jugs and buckets and got water from me two or three days

in a row because there was no water at 4801. During this time, Ms. Burnett not only used my shower but washed her clothes in my washing machine.

There was another different water problem later. Ms. Burnett asked if she could use my shower because the water in the upstairs bathroom tub would not come on. I came over and saw that the bathroom was in great need of repair. The bathtub fixture needed to be replaced. Some of the tile surrounding the bathtub was being held by old worn and frayed duct tape. There was a long deep gaping hole between a row of tiles which had an old piece of duct tape over a part of it. I remarked to Ms. Burnett about Ms. Jones once telling me about a constant water problem from the upstairs bathroom dripping down to the kitchen below. A few months before Ms. Jones moved out, Ms. Jones showed me the kitchen ceiling where Mr. Sharma had it patched. At that time, I asked her if Mr. Sharma had solved the water problem or had simply done a cosmetic repair. But once upstairs, I now saw that duct tape covered only some of the tiles in the bathroom which would easily allow water into the walls and down as to the kitchen ceiling below.

The Hoffman Construction Company is presently erecting a huge building at 41st Street, Davenport Street and Wisconsin Avenue, which is adjacent to 4801. Our neighborhood has an contract agreement with Hoffman for Hoffman to provide certain considerations.

Hoffman agreed to have the immediate residential properties inspected. That if, these properties sustained any damage as a result of their construction, Hoffman would be liable. 4801 and 4805 were two of these properties. My property required two

6

separate inspections which were over three weeks apart. The second time, around the middle of November, 1999, the inspector was finishing up with the rest of the neighborhood inspections. He said that he had trouble with Mr. Sharma not responding to allow the inspection. The inspector asked me if I knew how to get in touch with Mr. Sharma. I showed the inspector the "For Rent" sign in front of 4801 and told him that Mr. Sharma could be reached at that telephone number. I saw the inspector write the phone number down. I later learned that the inspection never took place.

Hoffman also arranged for the same properties to have all of their windows washed, inside and out for free. They'd also arrange for someone to also remove screens and storm windows. My property at 4805 had its windows washed for free under the contract. 4801's windows were not done.

_Constance K. Lyerly_
Constance K. Lyerly

Subscribed and sworn to before me this 24 day of August, 2000

_[notary signature]_
Notary Public, D.C
My Commission expires
11/30/01

7