## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JOYCE BURNETT**

    **v.**                          **CA 06-37 RBW**

**AMAR SHARMA, et al**

### ANSWER

COMES NOW Jennifer A. Renton, and in response to above cited Complaint, states her answers as follows:

1. Neither admitted or denied, having no knowledge of citations made.

2. Denied.

3. Neither admitted or denied, having no knowledge of the matter.

4. Neither admitted or denied, having no knowledge of the matter.

5. Neither admitted or denied, having no knowledge of the matter.

6. Neither admitted or denied, having no knowledge of the matter.

7. Neither admitted or denied, having no knowledge of the matter.

8. Denied in part, having know knowledge of the matters asserted; admitted in part in that at one time I rented a house from Amar Sharma and in turn, sublet a room to Complainant.

9. No knowledge of matter asserted.

10. No knowledge of matter asserted.

11. No knowledge of matter asserted.

12. No knowledge of matter asserted.

13. Denied.

RECEIVED

MAR 1 0 2006

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

14. Denied.

15. Denied.

16. No knowledge of matter asserted.

17. Denied.

18. Denied.

19. Denied.

20. Denied

21. No knowledge of matter asserted.

22. Denied.

23. Neither admit or deny. Complainant was not responsible for a portion of my rent. She was responsible to pay what I charged her for subletting a bedroom from me.

24. Denied.

25. No knowledge of matter asserted.

26. No knowledge of matter asserted in that I had no knowledge of the condition of the house after I no longer resided there. While I resided at the house, up until the time I left, the house, including furnace, was in good condition and repair.

27. Denied. None of these alleged conditions existed during the time I resided in the house. None of these alleged conditions existed at the time I vacated the house. The house was immaculate and in excellent condition at the time I vacated the house. I have no knowledge of the condition of the house after I ceased to reside there.

28. No knowledge of matter asserted.

29. Denied.

30. I know of no life threatening housing codes or other housing codes pertaining to the house in question. I never knew of Mr. Sharma to fail to make a needed repair while I occupied the house. I have no knowledge of what occurred after I left the house.

31. Denied, except that I have no knowledge of what happened after I vacated the house.

32. Denied, except that I have no knowledge of the condition of the house after I vacated the house.

33. I have no knowledge of the matter.

34. Denied, except that I have no knowledge of what happened after I vacated the house.

35. Denied, except that I have no knowledge of what happened after I vacated the house, but it appears there was no violation if there was no citation after inspection.

36. I have no knowledge of the matter.

37. Denied as to direct result in that exposure to anything it the house would have been the due to Complainant's own illegal actions, not the actions of any other person or entity. I have no knowledge of what is complained of.

38. I have no knowledge of what is complained of in #38.

39. I have no knowledge of whether or not Complainant had pre-existing medical conditions but she did exhibit signs that indicated she may have had pre-

exisiting mental or emotional conditions: she was rigid and inflexible, paranoid, constantly interjected the issue of race into every context, extremely socially isolated, and perhaps disordered in her desire to sue landlords in that Complainant also sued her landlord at Corcoran Street and is now suing Mr. Sharma.

40. I have no knowledge of the matter asserted.

41. Denied.

42. I have no knowledge of the matter.

43. Denied, except that Complainant did install her own locked mailbox, did seek a restraining order, and which of course was not granted because the judge could tell the allegations the Complainant made against my husband were false. All other portions of #43 are denied as false.

44. I have no knowledge of the matter asserted.

45. Denied. I have no knowledge of the matter regarding whether or not Mr. Sharma has refused to sell, rent or lease the premises to the Complainant. However, if it is the case that Mr. Sharma has refused to rent or lease the premises to Complainant, I am certain that his decision was not based upon considerations of race because Mr. Sharma loves all people alike. If it is the case that Mr. Sharma did not sell the property to Complainant, it can only be because she did not meet the market price he asked for. I am quite certain that IF Mr. Sharma wished to sell the house, he would sell it to any person who could pay the amount he wanted for the house.

46. I have no knowledge of what occurred after I left the house. However, in addition to renting a room to the Complainant, I rented rooms to at least three other African Americans, several Japanese students, and a variety of other people. Mr. Sharma was unfailingly kind, courteous to all the people he met at the house. He himself is of Indian descent. I never saw or heard anything remotely indicative of anything other than kindness, respect and compassion for all people from Mr. Sharma.

47. I have no knowledge of what occurred after I vacated the house after I gave written notice of my intention to leave the house, cleaned it up completely, and returned the key to Mr. Sharma. It is my understanding that Mr. Sharma is the owner of the house.

48. I do not have first hand knowledge of the matters asserted. However, I do know that the house was considered to be in a highly desirable location. I do know that while I lived at the house it was not uncommon for persons to knock at the door and inquire as to whether the house was for sale or rent. I do know that when I first rented the house, my name and the names of my other two classmates were, all three of us, on the lease directly from Mr. Sharma. Long before I actually left, Mr. Sharma had indicated to me that after I no longer rented the house from him, he did not want whoever next rented it to sublet the house to unrelated persons anymore. He wanted a return to the pre-existing situation where all the occupants of the house were on a lease directly with him.

49. I have no knowledge of the matter.

5

50. I have no knowledge of the matter.

51. I have no knowledge of the matter, except to observe that if Mr. Sharma owned the house and had not sold or leased the house to the Complainant, I have no knowledge of how her eviction can be wrongful.   I can only conjecture that Complainant had already caused Mr. Sharma considerable distress which Mrs. Sharma must have observed in Mr. Sharma by the time she meet the Complainant.   Therefore, Mrs. Sharma may not have believed there was genuine friendship in Complainant's offer to shake hands.

52. I have no knowledge of the matter asserted.

53. I have no knowledge of the matter asserted.

54. I have no knowledge of the matter asserted.

55. I have no knowledge of the matter asserted, except that it would appear from Mr. Sharma's subsequently retaining different counsel, that the initial evictions actions were not filed properly.  I am unaware of Judge Jackson or Judge Bayley having ever presided over the landlord tenant court, where, it would seem, an eviction matter should have been filed.

56. I have no knowledge of the matter asserted, except that it would appear from Mr. Sharma's subsequently retaining different counsel, that the initial evictions actions were not filed properly.  I am unaware of Judge Jackson or Judge Bayley having ever presided over the landlord tenant court, where, it would seem, an eviction matter should have been filed.

57. I have no knowledge of the matter asserted.

58. I have no knowledge of the matter asserted, except that it would appear from

Mr. Sharma's subsequently retaining different counsel, that the initial

evictions actions were not filed properly. I am unaware of Judge Jackson or

Judge Bayley having ever presided over the landlord tenant court, where, it

would seem, an eviction matter should have been filed.

59. I have no knowledge of the matters Complainant asserts.

60. I have no knowledge of the matters Complainant asserts.

61. I have no knowledge of the matters Complainant asserts.

62. I have no knowledge of the matters Complainant asserts.

63. I have no knowledge of the matters Complainant asserts.

64. I have no knowledge of the matters Complainant asserts.

65. I have no knowledge of the matters Complainant asserts.

66. I have no knowledge of the matters Complainant asserts, except to state that if

it took Mr. Sharma seven actions in attempting to evict Complainant, it must

have been a highly scrutinized action that could not have been a wrongful

eviction.

67. I have no knowledge of the matters Complainant asserts, except to say that

while I had contact with Complainant when I occupied the house, none of the

harms she claims to have experienced in #67 occurred. I do know that in

word and in writing I explained to her I was vacating the house and therefore

the subletting arrangement she then had with me would necessarily no longer

be in effect because I was no longer leasing the house. It seems to me this

would have been self-evident. What followed appears to be Complainant's

shameful attempt to exploit Mr. Sharma. When she was unsuccessful, she then claimed to have been victimized. However, whatever "harms" Complainant says she has experienced are, from what I understand, entirely of her own creation. Had she behaved in a lawful manner, vacated the house in a timely fashion, and formed her own legal landlord tenant relationship elsewhere, she could have moved on with her life. Instead she appears to have made having sublet a bedroom for a year the major thing that has happened to her in the last ten years. (However, I do not know whether, after I left, she ever offered to actually lease the entire house or to actually buy it outright at a good, fair market price that Mr. Sharma agreed to.)

68. Denied. I recall hearing Mr. Sharma gently say to Complainant that she could not remain in the house after I left. I recall her saying something like I intend to buy the house, Mr. Sharma. (The house was not for sale at the time.) Mr. Sharma gently pointed out that the price of the house would be out of her reach. (This conclusion was based on observable material circumstances and Complainants own assertions that she had to be frugal. It was not based on race or other matters.) I distinctly hear Complainant reply to Mr. Sharma, "You don't know my reach, Mr. Sharma." Whether she ever actually made Mr. Sharma an actual offer to buy the house I do not know.

69. I have no knowledge of Mr. Sharma ever agreeing to sell the house to the Complainant. I am unaware of Mr. Sharma intending to put the house up for sale. From my knowledge of Mr. Sharma, if he had intended to sell the house,

he would have sought out willing and able buyers and it would have been their

their finances, not race, would have been his sole consideration.

70. I have no knowledge of the matter asserted except that it was baffling to me

that Complainant claimed she was entitled to remain in the house that had a

market rental value of approximately $1600 to $2000 by trying to pay that

portion she sublet from me, $400, directly to Mr. Sharma.  I do not know if

she ever discussed with Mr. Sharma where she thought the remaining $1200

to 1600 in monthly rent would come from

71. Denied.

72. I have no knowledge of the matter other than the most likely reason DCRA

did not cite Mr. Sharma is because there were no "deadly levels of carbon

monoxide and black toxic mold."  There certainly were no such health hazards

present during the 10 or so years I occupied the house.

73. I have no knowledge of whether the house was appraised and no knowledge

of why Complainant should have been provided a copy of an appraisal.

74.  Denied, it that the Complainant had no constitutional right I know of to

occupy the house after I vacated the house.  I am unaware of the Complainant

having a lease to the house, or title to the house.  I do not observe  the

Complaint making an asserting she offered to rent or buy the house for full,

fair market price.  Other than that, I have no knowledge of the matters

asserted.

75. Denied.  I have no knowledge of the matters asserted after I no longer

occupied the house.  None of Complainant's civil rights were infringed upon

while she sublet the bedroom for one year. Her having sublet the bedroom for

a year, did not endow her with civil or property rights regarding the house in

question that I am aware of, after I no longer leased the house.

76. As stated above, I deny or have no knowledge of what is asserted.

77. I have no knowledge of how the citation of this code is applicable to the

situation complained of.

78. Denied. There were no sub-tenants in the house, other than the Complainant

who was no longer a sub-tenant, after I gave proper notice, returned the keys,

and vacated the house.

79. Denied. After vacating the premises, I did not wish to see Mr. Sharma

exploited by anyone, but if Mr. Sharma had wished to sell the house, and if

Complainant had wished to buy the house, and was able and willing to pay a

fair market price for the house that was acceptable to Mr. Sharma, I would

have been pleased for them both. However, it was not my understanding that

Mr. Sharma wished to sell the house or that Complainant was able to buy the

house.

80. I have no knowledge of the matter except as stated above, that Mr. Sharma

had many times stated that after I left the house he no longer wanted the

house rented out to unrelated persons who occupied the house on a subtenant

basis. I recall he stated he had been able to rent it to a couple who were able

to pay a full year's rent in advance. However, as I understand it, they were

not able to occupy the house because Complainant refused to move out.

81.  Denied.  I am certain the ability to pay a full year's rent in advance, on their

own based on income rather than having to resort to subletting the house to

unrelated persons to make the rent, was the basis upon which Mr. Sharma

desired to rent to the couple.

82. I have no knowledge of the matter but observe that the filing of eviction

actions to obtain the ability to rent, lease, sell or occupy a house one lawfully

owns, and should be in possession of,  is not frivolous.

83. I have no knowledge of what occurred after I left the house regarding these

matters.  I have no knowledge of Complainant seeking to enter a lease or ever

actually offering to buy the house while she sublet the bedroom from me.

84. Denied.

85. Denied.

86. Denied.  Complainant is fully aware that her race had nothing to do with what

transpired in her dealings, or attempted dealings, with Mr. Sharma.  Any

humiliation, embarrassment, pain and suffering she has experienced regarding

the house can only be the result of her own unlawful and exploitive actions.

Complainant maliciously uses race to mask her motives and actions.

Complainant is fully aware that at the time she applied to rent the room, a

Caucasian woman, moments before Complainant, expressed a desire to rent

the room.  I ironically chose to rent the room to the Complainant instead of the

other woman because, at that time, the street was not as diversified enough in

my opinion.  I would not have rented from Mr. Sharma if he had ever

indicated being racist.  All he ever specifically said to me about discrimination

was, once in passing, was that he had experience prejudice and it was painful. (He is Indian.)

87. I have no knowledge of the matter, other than to state that if Complainant was a ready, willing and able buyer she should have presented her credentials to Mr. Sharma so he could know she had the ability to buy the house, if he did wish to sell it, at a fair market price satisfactory to him. Mr. Sharma should not be forced to sell his house to Complainant at under the market price as a result of her refusal to leave, complaints she has been able to drum up as a result of her refusal to leave, and her litigious conduct thereafter.

88. Denied or have no knowledge of, as stated above.

89. Denied as irrelevant; see Answer #86.

90. I have no knowledge of. See Answer #87.

91. See Answer to #87. Other than that, and as answered above, I have no knowledge of the matter.

92. I have no knowledge of, except to observe by Complainant's own admission, it would seem she had abundant notice to quit.

93. Denied. See Answers No. 86 and 87. I am unaware that Complainant ever offered to lease the house by being willing to sign a lease that made her and her alone liable for the entire lease amount. While I resided at the house, I alone was liable to Mr. Sharma for the rent, and no other person.

94. Denied or no knowledge of, as set forth above.

95. Denied. The Constitution protects the property rights of the owner, not a person who has no title to a house, no lease to rent a house, and no claim to a

house. The Constitution's guarantees of Due Process, by Complainant's own admission, have been provided to Complainant in abundance.

96. Denied. Complainant has no possessory interest or property right to the house that I am aware of. It is my understanding that Mr. Sharma owns full, free and clear title to the house. I am unaware of how subletting a bedroom for a year from a tenant who thereafter vacated the property with notice and surrendered the keys would somehow endow the Complainant with even the remotest claim to possessory or property rights to the house.

97. I have no knowledge of the matter asserted. I am now aware of how Complainant's remaining in the house after I vacated could be legally termed a "tenancy." If judgments were rendered in courts without jurisdiction, it would not appear that such judgments would need to be appealed.

98. As I understand the term, the word "tenant" does not legally describe Complainant's status after I surrendered the lease and occupancy of the house.

99. See Answer #99. I am unaware of whether or not or how many times Complainant received written notice or to what written notice she was actually entitled after I left. Before I left I provided her, ample advance notice, in writing, that I was vacating the house. I believe I further explained that this meant that her sub-tenant occupancy through me would therefore no longer be in effect and therefore, she could no longer live there as my subtenant. I may have taken this additional precaution because Complainant had many times stated that she would never leave the house. She would state that she had as much right to be in the house as I did. I would reply that I had the lease, so

we had different relationships to the house and Mr. Sharma. I had the

responsibility of providing the monthly rent to Mr. Sharma and was liable for

it if I failed to do so. She did not share this liability. She on the other hand,

rented from me, not Mr. Sharma. If she failed to pay her rent I could try to

collect it but Mr. Sharma could not. Complainant would not acknowledge any

of these statements but would merely repeat she would never leave the house.

Her expression in making these statements was always the same and

disturbing to me. She would look very gleeful, even rapturous, when stating

she would never leave the house.

100.    I have no knowledge of what transpired after I left the house. I am

unaware of Complainant can mean by "rent" in that I am unaware that she

ever negotiated and signed a lease with Mr. Sharma to lease the house. It

would not make sense if she meant by "rent" what she owed to me as my sub-

tenant. Again, by her own admission she was given ample and repeated

notice. Refusing to vacate a house she has no right to occupy does not create

a "claim to possession." Even squatters for many years can only perfect a

claim after long and unchallenged occupancy.

101.    Denied to the extent I have knowledge. I have no knowledge of what

occurred after I terminated the lease I had with Mr. Sharma. However, Mr.

Sharma knew I had sublet to many persons, including at least four African

Americans during the time I leased the house from him and he never

commented upon them or any of my other renters for that matter. I am

unaware of whether Mr. Sharma ever rented directly to an African American,

or whether any African American ever sought to rent a house from Mr. Sharma. I think I recall Mr. Sharma saying he either rented to or somehow assisted a Vet who became partially visually impaired who happened to be African American. The architect Mr. Sharma hired when he thought of adding a another bathroom to the house was African American. When Mr. Sharma learned my dad was suffering from infirmities he offered to add on a bathroom downstairs so I could take care of him. Mr. Sharma did many kind things for others and he did not seem to notice what race they were, as far as I could tell.

102.    Denied for aforesaid reasons in so far as my knowledge goes. I am unaware of any right the Complainant has to Mr. Sharma's house.

103.    I have no knowledge of the matters asserted except that Mr. Sharma had not long lived at Bayard Street. I am unaware of any reason Mr. Sharma should not occupy his house at 41st street if he wished. I have driven by and seen that he has planted banana trees in the yard.

104.    Denied or no knowledge of the matter, as stated above.

105.    I have no knowledge of the cited statute or how it applies to the Complaint.

106.    I have no knowledge of what Mr. Sharma assumes and Complainant can have no knowledge of what Mr. Sharma's state of mind is, or was, either. I heard Mr. Sharma and Complainant discuss the necessity for her leaving and her refusal to do so, her statement that she wanted to buy the house, but her refusal to clarify what she would offer or how she would pay for the house.

This conversation led me to believe that there was ample opportunity to

actually rent or buy the house if the Complainant had wish to and could have

actually afforded to do so.  I did not observe Mr. Sharma ruling it out, only

unfruitfully attempting to sound her out and see if there were any substance

behind mysterious statements Complainant made about being able to buy the

house if she wished.  However, I have no knowledge of what Mr. Sharma and

Complainant said to eachother after I vacated the house.

107.    Denied.

108.    Denied or no knowledge of, as stated above.

109.    Denied.  I have no knowledge of what happened after I vacated the house,

but I do know it is hard to imagine a less intimidating person than the elderly

and gentle Mr. Sharma.  I do know the obstructive activities appeared to be on

the Complainant's part, not Mr. Sharma's.

110.    Denied.  The house was in good condition during the entire time I

occupied the house.  No one ever became ill that I know of as a result of living

in the house.  It is inexplicable why Complainant insisted she would never

leave the house, and thereafter refused to leave the house after I left, if she

believed the house posed "dangers to human life."

111.    I have no knowledge of these matters because they occurred after I no

longer leased or lived in the house.

112.    Denied.

113.    Denied.

114.    Denied. I am unaware of Complainant having a disability, other than what

she has asserted in this Complaint.

115.    I have no knowledge of what the cited code stands for or how it applies to

the Complainant.

116.    Denied. The house was always kept in good condition while I lived there.

I have no knowledge of how the house was maintained after I left.    I have no

knowledge of the Complainant's medical condition. As I understand it,

Complainant refused to leave when she had no legal basis to remain in the

house after I left. She at length was evicted. She now blames Mr. Sharma for

a number of things that would appear to be, if they exist, the direct result of

her own illegal occupancy.

117.    Denied. I am aware of no lease created after the fact. I am aware of no

medical condition of the Complainant. I am aware of no job the Complainant

obtained or lost. However, I have knowledge of behaviors manifested by the

Complainant which make retaining employment difficult for the Complainant.

118.    Denied.

119.    Denied while I resided and leased the house. I have no knowledge of what

happened between Mr. Sharma and Complainant after I no longer leased the

house.

120.    Denied. I have no knowledge of a code that provides a basis for a cause of

action for failure to prevent a conspiracy. I have no knowledge of a

conspiracy.

121.    Denied. No elements of conspiracy have been alleged or established.

122.    I have no knowledge of the claim made in No. 122.

123.    I have no knowledge of the claim made in No.123.

124.    I have no knowledge of the claim made in No. 124.

125.    I have no knowledge of the claim made in No. 125, or when such events

were alleged to occur. I do know that in cold weather, mimimal maintenance

by the occupant was required in order to keep the pipes from freezing and

bursting. Complainant was aware of what minimal maintenance was required

because her participation was required to keep the pantry door open to keep

the pantry warm and to keep the faucets at a slight trickle so the pipes would

not freeze in extreme cold.

126.    I have no knowledge of the claim made in No. 126.

127.    I have no knowledge of the claim made in No. 127.

128.    Denied.

129.    Denied. I have noknowledge of what the Complainant claims to be

entitled to other than erroneously claiming a right to remain in the house after

I no longer leased the house, and thus without a lease, and ti continue to pay

$400 for occupying the entire house. I am aware of no basis upon which

Complainant can lawfully or in good faith claim a civil, property or any other

right in connection to the house of Mr. Sharma.

130.    Denied. I am unaware of any way in which Complainant has been harmed

except by her own unlawful behavior. I am unaware of any conspiracy or the

appearance of conspiracy by any person involved, except for the fact that the

most reasonable explanation to explain Complainant's behavior is a

predetermined plan on her part so as to present such problems to Mr. Sharma that, because he dislikes conflict and unpleasant situations, he would have capitulated and sold or rented the house greatly below market price just to placate the Complainant, despite her unjust demands to that which is not hers and to which she had nor has any lawful claim.

131.    Denied. I have no knowledge of what right to possession to the house Complainant could possibly have. I have no knowledge of anyone making decisions based upon race after Complainant began to occupy the house, other than in the Complainants own mind.

132.    Denied. The law cannot remedy an individual who insists upon rights they do not have. The law cannot remedy persons who create situations in which they claim to be a victim but the situation is in reality entirely the result of their own wrongful actions.

133.    Denied. To my knowledge, any harm incurred by the Complainant is the direct result of her own exploitive actions. She had no acquaintances in the neighborhood whatsoever because she was almost always in her room. It appears that after I left the house Complainant formed a relationship with Constance Lyerly, who lived two houses away, but apparently, according to the Complainants own admission, this one relationship did not last long. Other than the paranoia I observed in Complainant's behaviors while I sublet a bedroom to her, I know of no reason why Complainant would attribute Ms. Lyerly's refusal to continue to remain in contact with the Complanant as due to a conspiracy.

134.   Denied or no knowledge of, as set forth above.

135.   Denied.

136.   Denied.

137.   Denied.

138.   Denied.

139.   Denied.

140.   Admitted in part. Denied in part. Mr. Sharma rented the house at first to

me and two other persons on the lease to him directly. After several years, the

other two occupants moved out and I renegotiated the lease, making myself

solely responsible for payment of the monthly amount of the rent to Mr.

Sharma. I know the house was always in good condition during the entire

total of approximately ten years that I occupied the house. I have no

knowledge of any rules and regulations that apply to D.C. owners and land

lord s that Mr. Sharma did not comply with.

141.   I deny or have no knowledge of, as stated above.

142.   Denied.

143.   Denied. I have no knowledge of Complainant renting directly from MR.

Sharma or of her seeking to rent the house itself or to buy the house. I have

no knowledge of the Complainant being adversely affected by her willful

refusal to vacate the premises after she no longer sublet the room from me.

To my knowledge, Complainant never rented from Mr. Sharma or offered to.

TO my knowledge, Complainant never offered to buy the house from Mr.

Sharma. To my knowledge Mr. Sharma did not desire to sell the house at a

time when property values where skyrocketing. I have no knowledge of what occurred regarding these matters after I no longer leased the house from Mr. Sharma.

144.    I have no knowledge of what Complainant claims in Number 144. To my knowledge, Mr. Sharma was retired and owned one or two houses he had bought a long time ago.

145.    Denied. I have no knowledge of what appeared after I no longer rented the house, but Mr. Sharma, of Indian descent, confided in me he had felt pain from being discriminated against as a foreigner of the Indian race. I have no knowledge of him ever showing the least tendency in any dealing, for the ten years I knew him to treat persons other that with great respect, kindness, and courtesy, regardless of their gender, race, orientation, or whatever. On several occasions I observed Mr. Sharma was particularly compassionate to disabled persons, helping them if he could.

146.    Denied. See Answer to 145.

147.    Denied or I have no knowledge of, as set forth above.

148.    I deny (i) through (v) as it pertains to me. I have no knowledge of (i) through (v) pertaining to any other person.

149.    I have no knowledge of what Mr. Sharma said to Complainant.

150.    I have no knowledge of what Mr. Sharma said to Complainant.

151.    Denied as pertains to me. I have no knowledge of what Complainent asserts pertaining to the actions of any other persons.

152.    Denied or I have no knowledge of, as set forth above.

153.    I have no knowledge of the conditions Complainent claims to now suffer. I deny that she manifested any disability while she sublet the bedroom from me but it may be that some of her paranoid and other behaviors were early signs of the tumors and nervous disorders Complainant now claims she suffers from

154.    Complainant did not own a car while she sublet the bedroom from me.  I have no knowledge of her owning or being able to drive a car after I no longer leased the house from Mr. Sharma.  I have no knowledge of medications taken by the Complainant.  I have no knowledge whether Complainant's license is suspended, or why it is suspended, if so.

155.    I have no knowledge of how Complainant can base numerous and catastrophic complaints as a result of subletting a bedroom for approximately a year.  I have no knowledge of whether or how Mr. Sharma and his family's could have in any way had any responsibility or part in conditions Complainant may now experience.

156.    I deny or have no knowledge of, as stated above.

157.    Deny in part.  Agree in part.  Mr. Sharma had a general knowledge that subtenants sublet the two additional bedrooms of the house.  He never specifically knew them unless, by happenstance, he encountered them in person while making a repair or improvement to the house.

158.    Denied as to life or even nonlife threatening housing code violations while I occupied and leased the house.  I have no knowledge of whether or not he failed to comply with any local statutes.

22

159.    I have no knowledge of what is claimed in Number 159.

160.    I deny or have no knowledge of what is claimed, as set forth above.

161.    I have no knowledge of Mr. Sharma's dealing with other rental properties and real estate he may have possessed. I do know that he never cared about the race of any person I sublet rooms to.

162.    As I recall, the furnace were relatively new, having been replaced a few years before Complainant sublet the bedroom. They were in perfect order at the time Complainant sublet the bedroom up until the time I no longer leased the house and vacated. I have no knowledge of what happened to these systems thereafter.

163.    I have no knowledge of the claims Complainant makes in Number 163. I do know that the furnace was in the basement. The ceilings on the living quarters, which were on the first and second floor were very high, approximately 9 to 11 feet. I also know the window sashes were very old, and it was impossible to create an air-tight space. The rooms were extremely large. I do not know, under these conditions, how it is possible for there to be a dangerous build up of $CO_2$.

164.    Denied. It is my recollection that the heater was installed by a professional workman, from a professional heater installation company, a few years before Complainant sublet the bedroom. After it was installed, some housing official came to inspect it and found it satisfactory, and took off a sign.

165.   To my knowledge the landlord did install and maintain the furnace and water heater in a sae, lawful, and proper manner. I do not know what happened after I vacated the house, or what duty the landlord owes to a person who occupies a house but has no right to do so.

166.   Denied. When Complainant moved into the house, there were two chimneys. One had been converted to coal burning in Victorian times and was therefore, blocked up. The other was definitely not blocked during the time I leased the house from Mr. Sharma and during the time Complainant sublet the bedroom from me. I know the chimney was not blocked because I personally hired Top Hat Chimney Sweeps to sweep it and make sure it was clear.

167.   Denied. While I occupied and leased the house, and while Complainant sublet the bedroom from me, Mr. Sharma never failed to "properly maintain, inspect, install the furnace, water heater, and chimney." The water heater was ample for three women and more than ample for one person living alone in the house. I do not know what happened regarding these matters after I vacated the house.

168.   I have no knowledge of Complainant's condition. I have knowledge of the effects of CO2 because I was exposed to it while renting another house and almost died from it . I saw my entire live passing before my eyes in a life review before passing out. I was rescued by firemen who found me in an unconscious state. I suffered no ill effects. Oxygen from breathing normally

the fresh air revived me completely. I was able to successfully take strenuous

exams a few days later.

169.    I have no knowledge of what Complainant suffered or how it could be

attributed to anything Mr. Sharma did or failed to do. If it is true that

Complainant suffers from the symptoms she describes, I am sorry she is

encountering such difficulties and hope she recovers fully.

170.    I do not know whether or not Complainant suffered from any pre-exisitng

medical conditions. I admit Complainant conducted an early morning

aerobics class at a local health club. I recall this fact because Complainant, as

a condition of subleasing the bedroom in the house, had promised me she

would not create noise before 7:00 a.m. She created noise every morning

around 6 a.m. attending this class. Complainant also assured me that she

rarely be home during the day, and was on a schedule very similar to a person

who had a 9 to 5 job. In reality, she almost never left her room. I expressed

to the Complainant that I found she had made false promises to me upon

which I relied as a condition of my subleasing the bedroom to her. I informed

her very soon after she began to sublease the room that I would not be

renewing her lease. As I recall, that was the first time I heard her state that

she would never leave the house and that I could not make her.

171.    Denied as to when I leased the house. I have no knowledge of these

matters after I no longer lived in the house.

172.    Denied as to when I leased the house. I have no knowledge of these

matters after I no longer lived in the house.

173.    Denied as to when I leased the house. I have no knowledge of these

matters after I no longer lived in the house. Denied as to res ipsa loquitur in

that there are an abundance of other explanations more likely than the ones the

Complainant proposes to explain what she complains if, if indeed these

conditions do exist.

174.    Denied or no knowledge of, as set forth above.

175.    Denied as to when I leased the house. I have no knowledge of these

matters after I no longer lived in the house.

176.    Denied as to when I leased the house. I have no knowledge of these

matters after I no longer lived in the house.

177.    Denied as to when I leased the house. I have no knowledge of these

matters after I no longer lived in the house.

178.    Denied as to when I leased the house. I have no knowledge of these

matters after I no longer lived in the house. I do know that I assisted in

moving the effects of the Complainant in both her room and in the basement.

There were books, papers, some kitchen paraphernalia and typical tourist

momentos. There was no mold or mildew anywhere in the house that I or any

of the occupants were ever aware of during the approximately ten years I

leased the house. If the pipes burst during cold months due to Complainants

failure to take the minimal precaution of keeping the faucets slightly on, I

cannot speak to what occurred after that. I have no knowledge why, if it is

true that Complainant manage to so position herself in the that she was able to

obtain some exposure to CO2 why she would assert her exposure, which if it

existed must have been extremely limited, was so much more consequential

that my exposure which actually produced unconsciousness.

179.    Denied as to when I leased the house. I have no knowledge of these

matters after I no longer lived in the house.

180.    Denied. I believe Mr. Sharma is entitled to punitive damages against the

Complainant for her abuse of the legal process.

181.    Denied or have no knowledge of, as set forth above.

182.    I have no knowledge of this matter.

183.    I have no knowledge of this matter.

184.    Denied or have no knowledge of, as set forth above.

185.    Denied or I have no knowledge of the matter.

186.    Denied or I have no knowledge of the matter, as set forth above.

187.    Denied or I have no knowledge of the matter, other than to state a person

occupying a house illegally, with no lease, no sublease, and without the

consent of the person leasing the house, or the owner of the house, does not

enjoy the right to peaceable and quiet enjoyment that belongs to those who

lawfully lease a property.

188.    Denied or I have no knowledge of the matter, as set forth above.

189.    Denied. After I no longer leased the house, Complainant no longer

maintained the status of subtenant.

190.    Denied as to when I leased the house. After I removed from the house, I

have no knowledge of the matter.

191.   Denied.  The Complainant has no remedy because any harms she has
suffered are due to her own willfull disregard of the fact that her sub-tenancy
ended when I no longer leased the premises.  After I vacated the house I have
no knowledge of what happened thereafter.

192.   Denied or I have no knowledge of, as set forth above.

193.   Denied as to when I leased the house.  I have no knowledge of these
matters after I no longer lived in the house.

194.   Denied or I have no knowledge of, as set forth above.

195.   I have no knowledge of the matter except to say that the house belonged to
Mr. Sharma and to my knowledge, Complainant had no lease with Mr.
Sharma or any right to be there.

196.   I have no knowledge of the matter.

197.   I have no knowledge of the matter and am unaware of why the owner
would need the permission of an unauthorized occupant prior to entering his
property.

198.   I have no knowledge of the matter other than to observe if, as Complainant
asserts, she prevented services from being terminated, she suffered no harm
from services being terminated.

199.   I have no knowledge of the matter, other than to observe that, unless there
was an agreement between Mr. Sharma and the Complainant I am unaware of,
the protections Complainants attempts to have apply to her do not apply to her
because she was not a lawful tenant of the premises after I terminated my
lease with Mr. Sharma.

200.    Denied or I have no knowledge of, as set forth above.

201.    Denied.  The premises were at all times it was leased by me, for

approximately ten years, a comfortable, enjoyable, pleasant and highly

habitable place to live.  I have no knowledge of the condition of the premises

after I left.

202.    I have no knowledge of a duty Mr. Sharma would owe to a person who

occupied his house without a lease and without his consent.

203.    Denied.  Except for happily volunteering to communicate with Mr.

Sharma about improvement he was making during the two weeks of my

honeymoon, Complainant never, to my knowledge, could possibly have

informed Mr. Sharma of anything that had to do with the house.  It was not

her place to communicate with Mr. Sharma regarding any problems with the

house because I leased the house from Mr. Sharma and I alone informed him

of problems.  He was always extremely responsive and took care of

everything quite well.  It appears to me that Complainant, early on, was

determined to participate as actively as possible and insinuate herself into

more than a subtenant role.  None of the other many prior tenants latched onto

Mr. Sharma and attempted to assume more than a subtenant role in the manner

Complainant did.  I know Mr. Sharma's actions were not retaliatory in that he

asked her to leave when he learned I was leaving but Complainant refused to

leave.  I am certain that this was prior to any reporting of Mr. Sharma to the

housing authorities that Complainant may have done.  From my ten years

acquaintance with Mr. Sharma, I know he seeks a contemplative, peaceful life

in service of his religion.  He abhors conflict.  He appears to me to be incapable of doing anything remotely vexatious or malicious.  He believes in peace and forgiveness and compassion.  I do not know who his legitimate actions to regain the control of a house that was lawfully his from the illegal occupancy of the Complainant can be construed as a "vendetta."

204.    Denied.  During the entire time I knew the Complainant, she was working on the same manuscript.  She may still be working on that manuscript.  The rigidity and paranoia I observed first hand in the Complainant are far more likely hindrances to the Complainant in her attempts to obtain and keep employment than anything Mr. Sharma could have ever done.

205.    Denied as to the time I occupied and leased the house.  I have no knowledge of what occurred after I left the house but it appears to me it is Mr. Sharma who would be entitled to punitive damages from the Complainant.

206.    Denied or I have no knowledge of, as set forth above.

207.    I have no knowledge of the matter asserted except to observe that Mr. Sharma was an experienced business man, who formerly worked at the World Bank, and had engaged in other real estate transactions.  All these matters, and his extreme caution when I signed the first and second lease with Mr. Sharma, make it highly unlikely that Mr. Sharma would ever enter into an oral contract regarding any property transaction with the Complainant.  I further did not know that oral agreements concerning property were binding.  I furthermore have no knowledge of any improvement the Complainant made, with or without the owner's consent, to the property, after I left.

208.   I have no knowledge of this matter and I have no knowledge of whether Mr. Sharma was aware of the appraisal or consented to the appraisal. I do know Mr. Sharma never discriminated on the basis of race or against students because there were many students of many races living in the house during the ten years I occupied it.

209.   Denied or I have no knowledge of, as set forth above.

210.   I have no knowledge of the matter asserted.

211.   I have no knowledge of this, other than to observe Complainant had no good reputation in the neighborhood during and up until the time I left the area.

212.   Denied or I have no knowledge of, as set forth above.

213.   I have no knowledge of the matter asserted, other than to observe previously, Complainant complains that Mr. Sharma failed to repair the premises. Here she complains he did make repairs but created some dust. I have no knowledge what Complainant did not dust or sweep up the area concerned herself if necessary. I have no knowledge of why opening the doors and letting some air in into that high ceiling house would not have quickly discharged any dust.

214.   I have no knowledge of any black mold or $CO_2$ existing in the house while I leased it. Complainant's fear and apprehension may have been due to her own conscience advising her of her wrongdoing in machinations designed to possess a house that did not belong to her in an unscrupulous manner.

215.   Denied or I have no knowledge of, as set forth above.

216.   I have no knowledge of the matter asserted.

217.   I have no knowledge of the matter asserted.

218.   Denied or I have no knowledge of, as set forth above.

219.   I have no knowledge of the matter asserted. See Answer Number 207.

Denied as to public policy argument which does not protect "squatters" from

forcing landlords to permit their occupancy. Denied as to the existence of a

conctract where there is no consideration and no writing and no witnesses.

220.   Denied as to when I leased the house, after I left the house I have no

knowledge of what is asserted, other than what is set forth above.

221.   I have no knowledge of the matters asserted, other than what is set forth

above.

222.   Denied as to when I leased the house, after I left the house I have no

knowledge of what is asserted, other than what is set forth above

223.   I have no knowledge of what is asserted other than to observe most

persons situation as Mr. Sharma was would never have anticipated the

outlandish claims made by Complainant. Mr. Sharma always tried to avoid

causing anyone emotional distress of any kind. I do not know who many law

suits Mr. Sharma initiated and how many law suits Complainant initiated that

caused her to miss time from work. I do know that courtroom clerks can issue

certification that court attendance was required, if that was true, and that

employers cannot discriminate against persons who miss work because they

were required to be in attendance at court. I therefore find it much more

probable that Complainant's employment difficulties are due to other causes

of her own making. I do not know if Complainant means she attended black

parties or means to allude to the annual "block" parties that all were welcome

to attend. I am unaware of any neighbors or friends with whom she had any

acquaintance in the neighborhood, because she was usually extremely

reclusive, except when I had company or when Mr. Sharma can to the house.

I only recall Complainant's participation in three social occasions. One was a

date with an attorney I fixed her up with. Another time a person and a couple

came to visit her from church. Another time her mother came to visit. None

of these persons lived in the neighborhood.

224.    Denied or I have no knowledge of, as set forth above.

225.    From my own exposure to CO2 and from living in the house for ten years,

the Complainant's statement that she was exposed to "clear and present

danger of mental disability and death from CO2" is amazing to me. However,

I have no knowledge of what occurred in the house after I no longer lived

there.

226.    I have no knowledge of what is asserted, other than to state it is amazing

to me that the Complainant, in addition to apparently unlawfully occupying

the house after I left, now seeks to be reimbursed for the  payments she made

when she did lawfully sub-lease the bedroom from me.   I have no knowledge

of payments she made into a court registry. I do not know if these were

payments she was court ordered to make. I do not know if  these were

actually payments she set up on her own accord as a result of Mr. Sharma

refusing to accept $400 from her a month in exchange for her occupying the

whole house after I left. I do not know what amount the Complainant paid

into the court registry, or whether she did so on a monthly basis.

227. Denied or I have no knowledge of after I no longer left the house, as set

forth above.

228. Denied. At no time that I know of, was there any discussion of any

attempt or desire to deprive Complainant of her civil, protected, or other

rights.

229. I have no knowledge of what Mr. Sharma produced. I has signed a lease

with Mr. Sharma long before I sublet the bedroom to Complainant.

230. I have no knowledge of what others called me or Complainant.

Complainant was my tenant in that I allowed her to sublet from me a bedroom

in the house for about $400 per month. I was in turn the tenant of Mr.

Sharma. That means I subleased the bedroom to Complainant and she had no

legal relationship to Mr. Sharma as a result of her relationship to me that I am

aware of. Every month I collected rents made out to me from the persons who

rented the bedrooms from me, usually there were two additional occupants in

the house other than myself. I then put these monies in my account and wrote

out a rent check to Mr. Sharma for the monthly rent I owned him for leasing

the house.

231. Denied or I have no knowledge of, as set forth above.

232. I have no knowledge of this.

233. Denied as to any participation Complainant alleges I had in what she here

asserts. I have no knowledge of what occurred after I left but can positively

state this appears to be a paranoid statement very like other paranoid beliefs
the Complainant believed or pretended to believe (such as my spying on her
by opening her mail or using her computer, etc.) I also know that Constance
Lyerly is a devout Christian and scrupulously honest person. It is
unbelievable to me that Complainant would claim she accepted a bribe or that
Mr. Sharma would offer her a bribe. A far more likely explanation of the
termination of this acquaintance can be found in Complainants own behaviors.

234.    I have no knowledge of what Complainant asserts.

235.    I have no knowledge of what Complainant asserts.

236.    I have no knowledge of what Complainant asserts.

237.    Denied or I have no knowledge of what Complainant asserts.

238.    I have no knowledge of what the Complainant asserts.

239.    Denied.

240.    I have no knowledge of what the Complainant asserts. I

241.    I have no knowledge of what the Complainant asserts. Mr. Sharma never
discriminated against any of my sub-tenants on the basis of race (at least four
of whom were African American) because he basically had nothing to do with
them.

242.    I t is my understanding that the lease I had entered into with Mr. Sharma
renewed at will. Under the terms of the lease, I rented the house. While I
rented the house, I could sublet rooms, which I did. When I no longer rented
the house, I could not sublet the rooms. Persons who sublet the rooms could
not continue to sublet the rooms from me after I no longer had a lease to the

35

house. That is my understanding. Therefore, it appears to me that
Complainant never had a lease to the house and that she only had the right to
be in the house while I was there, as my subtenant. I have no knowledge of
what Mr. Brand argued. What Complainant appears to attempt to assert here
is nonsensical because if I had no lawful right to lease the house prior to her
appearance, then I had no right to sublet a bedroom to her and therefore, her
occupancy would have been illegal even during the time I was in the house,
rather than only after I gave up the lease to the house and moved away.

243.   I have no knowledge of the matters Complainant asserts.

244.   I have no knowledge of what Complainant is asserting here. I do know
Mr. Sharma stayed out of who or how I sublet bedrooms in the house to others
over the years. He had a casual nodding acquaintance with persons when he
was at the house. Although I cannot speak for Mr. Sharma, it is my
understanding that he believed, as I did, that the persons I sublet the rooms to
were subtenants renting a room. I was the tenant renting the house from him.

245.   Denied or I have no knowledge of, as set forth above.

246.   Denied as to any part to this assertion that is intended to pertain to me. I
have no knowledge of matter asserted here regarding the actions of others,
except that it appears to me that Complainant is the one who has done what
she accuses others of here.

247.   I do not have knowledge of what occurred in Judge's chamber or what Mr.
Sharma said there or in a deposition. I do know that Mr. Sharma came to the
house and made repairs and would greet whoever he saw, being a gregarious

person. However, he may have assumed the person was a friend or a subtenant, I do not know. He often did not inquire whether the person was a regular subtenant or a guest. He was not there often enough and the turn over was high enough that it is doubtful Mr. Sharma kept track of who the subtenants were. At other times, if he was very focused on accomplishing a repair, he might not have taken notice of other persons in the house.

248.   Denied or I have no knowledge of. Complainant, during the time I occupied the house, was never a tenant of Mr. Sharma. I was the tenant. Complainant sublet a bedroom from me, that is all. Much later, Complainant made a point of introducing herself and insinuating herself into his religious events. However, if she had not done so, it is doubtful Mr. Sharma would have known of her existence. There were many subtenants he never met.

249.   I do not know what Mr. Sharma stated. I never heard Complainant make an offer to buy the house.

250.   I do not know. Hhowever, even if it were the case that "tenant" can sometimes includes "subtenant", it does not necessarily follow that "subtenant" also includes the term "tenant." In this fact specific case, during the time I resided at the house, I was responsible for paying the rent to Mr. Sharma. I had the lease with him. I was the tenant. Other persons who lived at the house did so only upon application and arrangement made with me and money for subleasing they paid to me. These other persons, including Complainant, were not tenants of Mr. Sharma. They were my sub-tenants. I was the tenant of Mr. Sharma.

37

251.   I have no knowledge of what Mr. Sharma stated. I never heard Complainant offer to rent the house from Mr. Sharma. I heard her brag she could buy the house from Mr. Sharma if she wanted to, and that no one could ever get her to leave the house, but I never heard her actually make an offer to buy the house to Mr. Sharma. I did hear Mr. Sharma attempt to sound her out and state to her that the house was out of her reach. I distinctly recall Complainant responding only with, "You don't know my reach, Mr. Sharma." I do not know if Complainant ever demonstrated the financial ability to buy the house from Mr. Sharma or discussed a price with him. I do not know whether Mr. Sharma had any desire or intention of selling the house to anyone.

252.   I have no knowledge of what occurred at a hearing at an unnamed date at an unnamed court. However, to the best of my recollection, it is true that all of my sub-tenants, including Complainant, who rented a room from me made out their checks to me. I deposited these in my personal checking account. I then wrote a check from my personal checking account for the monthly rent I owed to Mr. Sharma.

253.   I have no knowledge of what rent checks Complainant can be referring to because I am unaware of her paying anything other than the checks she paid to me to sublet the bedroom. Mr. Sharma rarely raised the rent. It may be that in 1993 there was a raise in rent. I do not recollect Mr. Sharma raising the rent after 1993, although he certainly reasonably could have done so.

Respectfully submitted,

*Jennifer A. Renton*

Jennifer A. Renton, pro se
P.O. Box 526
Edgewater, MD  21037
(240) 460-3232

SUBSCRIBED AND SWORN to me this ___/0___ day of _March_ 2006

My commission expires:
Feb. 6, 2008

State of Maryland.
County: Anne Arundel